**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **U.S. SECURITIES AND EXCHANGE COMMISSION,**<br>**Plaintiff,**<br>**v.**<br>**MICHAEL P. HANLON and J. STREICHER FINANCIAL, LLC,**<br>**Defendants** | **Civil Action No. ______**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff U.S. Securities and Exchange Commission (the "Commission") files this Complaint against Defendants Michael P. Hanlon ("Hanlon") and J. Streicher Financial, LLC ("JS Financial") (collectively, the "Defendants") and alleges the following:

## SUMMARY

1. In early 2022, Defendants induced AutoLotto, Inc. ("Lottery"), a company that sold lottery tickets on-line and which had recently become public, to give JS Financial $15 million for investment in U.S. Treasuries, AAA-rated bonds, or other U.S. securities.

2. According to the written agreements between the Lottery and JS Financial, the $15 million would be held in a non-depleting escrow account in

Lottery's name, to which Lottery would have access, and earn a 2% return per month, with the funds being returned to Lottery as early as six months.

3. All of this was false, as none of Lottery's funds were used to acquire U.S. Treasuries, AAA-rated bonds, or other U.S. securities.

4. Instead, just two days after Lottery deposited its $15 million for the purported investment with Defendants, Hanlon used that money to fund the acquisition by JS Financial's parent company of a 49% interest in a joint venture real estate development project.

5. Concurrent with that acquisition, Hanlon also caused the parent company to enter into a separate agreement to borrow $5 million from the real estate joint venture. In Ponzi-like fashion, Hanlon then used substantially all of the $5 million in loan proceeds (which came from Lottery's $15 million) to repay investors in a prior failed venture in Europe that had been offered by the parent company.

6. Hanlon also used a portion of the $5 million loan to pay associates and relatives, expenses owed by other affiliates of the parent company, and expenses for other businesses with which Hanlon was affiliated.

7. In May 2022, when Lottery partially discovered Hanlon's wrongdoing, Hanlon misrepresented that Lottery's funds were safe and intact.

8. By the time Lottery discovered the full scope of Defendants' fraud, Lottery's funds had been squandered.

9. Through the Defendants' misconduct, Lottery lost substantially all of its $15 million.

## VIOLATIONS

10. By virtue of the foregoing conduct and as alleged herein, the Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. The Defendants also violated Sections 206(1) and 206(2) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. §§ 80b-6(1) and (2)], or, in the alternative, JS Financial violated Sections 206(1) and 206(2) of the Advisers Act, and Hanlon aided and abetted those violations. Unless restrained and enjoined, Defendants will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21(e) [15 U.S.C. §§ 78u(d), (e)] and Sections 209(d) and 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(d), (e)].

12. The Commission seeks a final judgment: (a) permanently enjoining (i) the Defendants from violating the federal securities laws and rules that this Complaint alleges they have violated; and (ii) Hanlon from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities in his own personal accounts, and from, directly or indirectly, acting as or being associated with any investment adviser; (b) ordering Hanlon to disgorge all ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon; (c) ordering the Defendants to pay civil money penalties; and (d) ordering any additional relief the Court may deem just and proper.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to Exchange Act Sections 21(d), 21(e), and 27 [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].

14. Defendants, directly and indirectly, have made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

15. Venue lies in this District under Exchange Act Section 27 [15 U.S.C.

§ 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], because certain of the transactions, acts, practices, and courses of business constituting violations of the Exchange Act and Advisers Act occurred within the Northern District of Georgia. Additionally, Hanlon resides in the Northern District of Georgia and JS Financial's principal place of business is in the Northern District of Georgia.

## DEFENDANTS

16. **Hanlon**, age 62, resides in Atlanta, Georgia. At all times relevant, Hanlon served as President and CEO of JS Financial and controlled JS Financial's operations. From 2019 through December 2022, Hanlon also owned 15% of, and served as President and Chief Executive Officer of the Americas for, JS Financial's parent company, J. Streicher Global Partners LLC ("JS Global").

17. **JS Financial** is a Delaware limited liability company formed in March 2021, with its principal place of business in Atlanta, Georgia. JS Financial is a wholly owned subsidiary of JS Global, which purportedly operates in the real estate, technology, and sustainability industries, as well as in capital markets.

## FACTS

### A. Background of JS Financial

18. In 2022, JS Financial offered investment advisory services to a variety of potential or actual clients.

19. In addition to Lottery, JS Financial entered into escrow agreements

and asset management agreements with other clients under which JS Financial was to provide advisory services for those clients.

20. For example, Hanlon solicited at least one other potential client to enter into agreements like those Lottery signed (described in greater detail below). However, it appears that shortly after that potential client made a deposit in an account to be managed by JS Financial, Hanlon refunded the money.

21. In other cases, JS Financial agreed to accept and manage client deposits under agreements that provided that JS Financial would invest the clients' money in U.S. Treasuries, AAA-rated bonds, or U.S. securities, and would be paid a fee of 2% of the deposited money for these services.

**B. Defendants Solicit a $15 Million Investment from Lottery**

22. In or around January 2022, Hanlon and JS Global were seeking new investor capital, in part because JS Global was struggling to pay back investors in a prior failed venture in Europe that Hanlon had helped run.

23. At the same time, Lottery, a newly public company, was struggling to stay afloat.

24. In or around January 2022, executives of Lottery were introduced to a representative of JS Financial, who also worked as a fundraiser for JS Global. In a series of meetings, the representative, repeating information that Hanlon had provided him and acting at Hanlon's direction, told Lottery's executives that JS

Global, through JS Financial, could help Lottery solve its cashflow problems through a substantial cash investment that would be managed by JS Financial.

25. The representative claimed that (a) JS Global had several billion dollars in assets under management, which allowed it to leverage any cash deposits made into a particular account at a ratio of 4:1; (b) using the additional cash generated by this leverage, JS Financial could invest through an automated proprietary trading platform, which would produce significant returns each month; and (c) Lottery would receive a return of 2% per month, with all additional profits going to the Defendants.

26. The representative further explained that, because JS Financial would only be investing the additional funds generated through its leverage capabilities, Lottery's principal would never be touched – that is, Lottery's account balance would always remain at or above $15 million.

27. To further enhance Defendants' credibility, the representative touted that JS Global and JS Financial were affiliated with J. Streicher & Co., LLC, a hundred-year-old firm that claims to be the oldest specialist electronic Designated Market Maker unit on Wall Street. In reality, JS Global, through another subsidiary, owned a minority interest in J. Streicher & Co. and had purchased the right to use the J. Streicher name from J. Streicher & Co.

28. Before agreeing to invest with JS Financial, Lottery's executives

requested an online meeting with Hanlon. During that meeting, Hanlon confirmed all of the representative's prior statements about JS Financial and JS Global and encouraged Lottery to entrust JS Financial with Lottery's funds.

29. On or about March 9, 2022, Lottery and JS Financial executed multiple agreements to effectuate the investment, including (a) a management agreement ("Management Agreement") appointing JS Financial to act as investment manager that would provide "investment management services" to Lottery; and (b) an escrow and deposit account pledge agreement ("Escrow Agreement"), pursuant to which JS Financial would act as "Escrow Agent" and "Asset Manager."

30. Hanlon signed the Management and Escrow Agreements (collectively the "JS Financial-Lottery Agreements") as President and CEO of JS Financial.

31. The JS Financial-Lottery Agreements contained explicit representations as to how JS Financial would invest Lottery's funds in securities.

32. Specifically, JS Financial, as the "Manager," would escrow Lottery's funds and use that cash to obtain leverage, which JS Financial would "invest and reinvest" in "Permitted Investments" - expressly limited to U.S. "Treasuries, AAA-rated bonds, and U.S. securities."

33. JS Financial would also "maintain the non-depleting value" of the escrow account, which would not drop below the amount Lottery deposited. JS

Financial would monitor the investments' performance, send monthly statements, pay a return rate of 2% per month, and return the funds in the escrow account to Lottery as early as six months.

34. Hanlon also orally represented that he and JS Financial would retain any earnings above the 2% return as compensation.

35. On or about March 15, 2022, based on these representations, Lottery transferred $15 million to a JS Financial bank account.

**C. The Defendants Misappropriate Lottery's Money**

36. Defendants did not invest Lottery's money in U.S. Treasuries, AAA-rated bonds, or U.S. securities (the "Permitted Investments"), nor keep Lottery's funds in a non-depleting escrow account.

37. Instead, on March 17, two days after Lottery transferred the $15 million, Defendants diverted Lottery's money for unauthorized purposes.

38. Specifically, on or around March 17, 2022, Hanlon and JS Financial used Lottery's $15 million to fund JS Global's acquisition of a 49% ownership interest in JS Private Equity Group ("JS PEG"), a joint venture real estate development project. This investment was not a permitted use of the Lottery's money under the JS Financial-Lottery Agreements.

39. On behalf of JS Global, Hanlon executed the joint venture agreement, pursuant to which the other owner contributed an ongoing real estate project to JS

PEG for its 51% ownership interest in JS PEG.

40. Lottery's $15 million, which Hanlon and JS Financial improperly invested in JS PEG, was then used in several impermissible ways:

41. At Hanlon's request, JS PEG loaned $5 million back to JS Global pursuant to a loan agreement for JS Global to use for its own purposes. Hanlon then used approximately $4 million of these funds to make Ponzi-like payments to investors in JS Global's earlier failed venture in Europe. Hanlon also used some of the $5 million to make smaller payments to associates, relatives, and other affiliates of JS Global or other businesses.

42. Of the remaining $10 million with JS PEG, its 51% owner used approximately $9 million to satisfy debts owed by foreign affiliates of the 51% owner.

43. The 51% owner of JS PEG later loaned the remaining $1 million back to JS Financial, which, likely under the pretext of paying returns generated from securities trading, then used approximately $900,000 of that money to pay a third party at the instruction of Lottery.

44. By May 11, 2022, virtually all of Lottery's $15 million investment had been depleted. Hanlon and JS Financial did not invest any of Lottery's $15 million in Permitted Investments.

**D. Hanlon's Additional Efforts to Deceive Lottery**

45. After Defendants failed to provide account statements to Lottery as provided by the Management Agreement, Lottery's representatives confronted Hanlon and demanded information about Lottery's investment.

46. By the time they met in early May 2022, Hanlon and JS Financial had misappropriated essentially all of Lottery's money.

47. At the May 2022 meeting, Lottery's representatives learned that Hanlon had invested the $15 million in JS PEG, in contravention of the Management Agreement, and that JS PEG had loaned $5 million back to JS Global.

48. After that meeting, between May 9 and May 12, 2022, Hanlon sent multiple misleading emails to Lottery's representatives and its auditors to suggest that the $15 million investment was still intact.

49. For example, on or about May 10, 2022, Hanlon sent a letter to Lottery falsely representing that "[t]he deposited amount will yield a two percent (2%) monthly coupon" and "will remain at non-depleting value of original deposited amount." At the time, Hanlon knew that virtually all of Lottery's original deposited amount had been depleted on the investment in JS PEG and the Ponzi-like payments to the JS Global investors, among other things.

50. The May 10, 2022 letter also represented that "J Streicher Financial,

LLC, along with its related entity [JS PEG] hold multiple accounts" at Bank A, and that there was "currently over $16.5 million across the multiple accounts."

51. The May 10, 2022 letter attached excerpts from statements for six bank accounts to support this claim.

52. In fact, most of the excerpted bank statements concerned accounts belonging to JS PEG and its 51% owner, and the funds in those accounts were not Lottery's.

53. On or about May 11, 2022, Hanlon sent a second letter to Lottery, which made several additional misrepresentations.

54. The May 11, 2022 letter stated that JS Financial "provides corporate cash management programs with guaranteed returns and protected principal," when, in fact, JS Financial was generating no returns for Lottery and had dissipated Lottery's $15 million principal.

55. The May 11, 2022 letter also falsely represented that Lottery's "principal" was in six "interest-bearing J. Streicher accounts at Bank A."

56. In fact, on the same day he sent this letter, Hanlon completed the final misappropriation of Lottery's funds from the JS Financial account.

57. On or about May 12, 2022, Hanlon responded to an inquiry from the Lottery's auditor regarding JS Financial's purported "cash management program" and falsely reported that Lottery's full investment had been held *in cash* at Bank A

as of March 31, 2022. Hanlon knew this statement was false because, prior to March 31, 2022, he had directed JS Financial to use Lottery's money to fund JS Global's acquisition of a 49% ownership interest in JS PEG.

58. In his message, Hanlon also stated that Lottery could access its capital with "technically no restrictions but we have kindly requested 72 hour notice," even though, by this time, Lottery's money was gone.

59. On or about June 22, 2022, Lottery demanded that Hanlon return the investment.

60. In response, Hanlon sent an email to Lottery's representatives, stating that "[w]e currently have an agreement in place amongst both parties which is fully in compliance," and that, nonetheless, JS Financial could potentially begin paying back the investment "as early as next week, with the hopes of returning the investment funds within the next 30 days."

61. None of this was true.

62. Defendants were not in compliance with JS Financial's agreements with Lottery, nor did any JS Financial bank account have sufficient funds to repay Lottery.

63. On or about July 22, 2022, JS Financial and Lottery signed a binding term sheet, in which JS Financial agreed to return the investment in three tranches, on July 25, 2022, August 5, 2022, and August 12, 2022.

64. Hanlon signed the binding term sheet on behalf of JS Financial.

65. JS Financial failed to fully return Lottery's principal on the agreed-upon dates or thereafter.

66. In total, JS Financial has returned only approximately $1.4 million to Lottery, in the form of payments to a third-party creditor of Lottery. These payments consisted of the $900,000 previously referenced as well as an additional approximately $500,000.

## COUNT I - FRAUD

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

67. Paragraphs 1 through 666 are hereby realleged and incorporated by reference.

68. During the period from approximately January 2022 through August 2022, the Defendants, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate

as a fraud or deceit upon other persons.

69. By reason of the foregoing, Defendants, directly or indirectly, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**COUNT II - FRAUD**

**Violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)]**

70. Paragraphs 1 through 666 are hereby realleged and incorporated by reference.

71. During the period from approximately January 2022 through August 2022, the Defendants, acting as an investment adviser to Lottery, using the mails and/or means or instrumentalities of interstate commerce, directly or indirectly, employed devices, schemes, and/or artifices to defraud an advisory client and/or prospective client.

72. The Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes, and/or artifices to defraud.

73. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will again violate Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT III - FRAUD

**Violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)]**

74. Paragraphs 1 through 66 are hereby realleged and incorporated by reference.

75. During the period from approximately January 2022 through August 2022, the Defendants, acting as an investment adviser to Lottery, by the use of the mails and/or the means or instrumentalities of interstate commerce, directly and indirectly, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit on an advisory client and/or prospective client.

76. The Defendants knowingly, intentionally, recklessly, and/or negligently engaged in the aforementioned transactions, practices, or courses of business.

77. By reason of the foregoing, the Defendants, directly and indirectly, have violated and, unless enjoined, will again violate Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## COUNT IV – AIDING AND ABETTING

**(Alleged in the Alternative to Count II as to Hanlon Only)**

**Aiding and Abetting Violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)]**

78. Paragraphs 1 through 666 are hereby realleged and incorporated by reference.

79. As alleged in Count II above, JS Financial committed primary violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

80. During the period from approximately January 2022 through August 2022, Hanlon knowingly or recklessly provided substantial assistance to JS Financial's violations of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

81. By reason of the foregoing and pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Hanlon aided and abetted JS Financial's violations, and unless enjoined will again aid and abet violations, of Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## COUNT V – AIDING AND ABETTING

**(Alleged in the Alternative to Count III as to Hanlon Only)**

**Aiding and Abetting Violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)]**

82. Paragraphs 1 through 66 are hereby realleged and incorporated by reference.

83. As alleged in Count III above, JS Financial committed primary violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

84. During the period from approximately January 2022 through August 2022, Hanlon knowingly or recklessly provided substantial assistance to JS Financial's violations of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

85. By reason of the foregoing and pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)], Hanlon aided and abetted JS Financial's violations, and unless enjoined will again aid and abet violations, of Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Making findings of fact and conclusions of law pursuant to Rule 52 of the

Federal Rules of Civil Procedure, finding that the Defendants committed the violations alleged herein;

**II.**

Permanently enjoining the Defendants and their agents, servants, employees and attorneys, and all persons in active concert or participation with any of them from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and (2)];

**III.**

Ordering Hanlon to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Sections 21(d)(3), 21(d)(5), and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**IV.**

Ordering the Defendants to pay civil money penalties pursuant to Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §§ 80b-9(e)];

**V.**

Permanently enjoining Hanlon from, directly or indirectly, including, but not limited to, through any entity owned or controlled by him, participating in the

issuance, purchase, offer, or sale of any security, provided, however, that such injunction shall not prevent him from purchasing or selling securities in his own personal accounts;

**VI.**

Permanently enjoining Hanlon from, directly or indirectly, acting as or being associated with any investment adviser; for purposes of this paragraph, a person is associated with an investment adviser if such person is a partner, officer, or director of such investment adviser (or performs similar functions), or, directly or indirectly controls or is controlled by such investment adviser, including any employee of such investment adviser; and

**VII.**

Ordering such other relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

**JURY DEMAND**

The Commission demands a trial by jury.

Dated: November 23, 2026

Respectfully submitted,

*/s/ M. Graham Loomis*
M. Graham Loomis
Supervisory Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622
Email: loomism@sec.gov

Robert F. Schroeder
Senior Trial Counsel
Georgia Bar No. 001390
Tel: (404) 942-0688
Email: schroederr@sec.gov

COUNSEL FOR PLAINTIFF
U.S. Securities and Exchange Commission
Atlanta Regional Office
950 East Paces Ferry Road, N.E. Suite 900
Atlanta, Georgia 30326-1382